ORIGINAL

FILED

JAN 0 4 2007

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| MARVIN DUANE LEE, Derivatively on Behalf of ARTHROCARE CORPORATION, | § § § | Civil Action No. |
| Plaintiff, | § § § | **A07CA009 SS** |
| vs. | § § | |
| MICHAEL A. BAKER, MICHAEL THOMAS GLUK, FERNANDO V. SANCHEZ, RICHARD A. CHRISTENSEN, JOHN H. GIROUX, SR., JOHN R. TIGHE, RON UNDERWOOD, DAVID APPLEGATE, BRUCE PROTHRO, JOHN T. RAFFLE, JEAN A. WOLOSZKO, BARBARA D. BOYAN, DAVID F. FITZGERALD, JAMES G. FOSTER, TORD B. LENDAU, JERRY P. WIDMAN and PETER L. WILSON, | § § § § § § § § § § § § § § § § | |
| Defendants, | § § § | |
| – and – | § § | |
| ARTHROCARE CORPORATION, a Delaware corporation, | § § § | |
| Nominal Defendant. | § § § § | DEMAND FOR JURY TRIAL |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACH OF
FIDUCIARY DUTY, ABUSE OF CONTROL, CORPORATE WASTE, GROSS
MISMANAGEMENT, CONSTRUCTIVE FRAUD, UNJUST ENRICHMENT, BREACH
OF CONTRACT AND ACTION FOR ACCOUNTING**

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of ArthroCare Corporation ("ArthroCare" or the "Company") on behalf of the Company against its Board of Directors and certain of its senior executives (collectively, "Defendants").  This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior ArthroCare insiders to divert hundreds of millions of dollars of corporate assets to themselves and other employees via the manipulation of grant dates associated with hundreds of thousands of stock options granted to ArthroCare insiders.  Each of the Defendants also participated in the concealment of the backdating option scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions in illicitly obtained incentive compensation and proceeds diverted to corporate employees from 1996 to the present.

2.      Between 1996 and 2006, Defendants also caused ArthroCare to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by ArthroCare carried with them an exercise price that was ***not less than*** the fair market value of ArthroCare stock on the date of grant and issuance.

3.      In fact, Defendants were aware that the practices employed by the Board allowed the stock option grants to be ***backdated*** to dates when the Company's shares were trading at or near the lowest price for that relevant period.  By August 2006, Defendants' backdating scheme had yielded stock option grants to the Company's executive officers worth millions of dollars.  These grants were included in more than $63 million in stock sale proceeds for Defendants.

- 1 -

4.      Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Texas and Delaware law.  By authorizing and/or acquiescing in the stock option backdating scheme, Defendants: (i) caused ArthroCare to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior ArthroCare executives; and (iii) subjected ArthroCare to potential liability from regulators including the SEC and the IRS.

5.      Defendants' gross mismanagement and malfeasance over the past decade has exposed ArthroCare and its senior executives to criminal and civil liability for issuing false and misleading financial statements.  Specifically, Defendants caused or allowed ArthroCare to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an inflated view of ArthroCare's earnings and earnings per share.

6.      Defendants' malfeasance and mismanagement during the relevant period has wreaked hundreds of millions of dollars of damages on ArthroCare.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations so as to void all grants made pursuant to the plans.  The Company has now been mentioned as one of several companies likely to have manipulated options. Meanwhile, certain of the Defendants, who received under-priced stock options and/or knew material non-public information regarding ArthroCare's internal control problems, abused their

fiduciary relationship with the Company by selling over $63 million worth of their personally held shares at artificially inflated prices during the relevant period.  This action seeks recovery for ArthroCare against these faithless fiduciaries, as ArthroCare's Board of Directors, as currently composed, is simply unable or unwilling to do so.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under state law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement.  In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

8.      This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

9.      This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  ArthroCare is located in and conducts its business in this District.  Further, Defendants conduct business in this District, and certain of the Defendants are citizens of Texas and reside in this District.

## PARTIES

11.     Plaintiff Marvin Duane Lee, is a shareholder of ArthroCare, and holds and has continually held ArthroCare stock since 1996.

12.     Nominal party ArthroCare is a Delaware corporation with its principal executive offices located at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

13.     Defendant Michael A. Baker ("Baker") has been a director, President and Chief Executive Officer ("CEO") of ArthroCare since July 1997.  Because of Baker's positions, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Baker participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Baker sold 597,800 shares of ArthroCare stock for proceeds of over $25.6 million during the relevant period.  Defendant Baker may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

14.     Defendant Michael Thomas Gluk ("Gluk") joined ArthroCare in December 2004 and has served as Senior Vice President and Chief Financial Officer ("CFO") of the Company since that time.  Because of Gluk's positions, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Defendant Gluk, by his specialized financial expertise, was in a unique

- 4 -

position to understand the business of ArthroCare as well as its finances, markets and present and future business prospects. During the relevant period, Gluk participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Gluk sold 1,150 shares of ArthroCare stock for proceeds of $52,900 during the relevant period. Defendant Gluk may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

15.     Defendant Fernando V. Sanchez ("Sanchez") has served as Senior Vice President of Business Development since March 2002. In May 2002, Sanchez was appointed to the position of CFO and Assistant Secretary of ArthroCare and served in this capacity until December 2004. Because of Sanchez's positions, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Defendant Sanchez, by his specialized financial expertise, was in a unique position to understand the business of ArthroCare as well as its finances, markets and present and future business prospects. During the relevant period, Sanchez participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Sanchez sold 74,220 shares of ArthroCare stock for proceeds of over $3.3 million during the relevant period. Defendant Sanchez may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

16.     Defendant Richard A. Christensen ("Christensen") has served as Senior Vice President, Operations of ArthroCare since August 2002 and became Administrative Manager for ArthroCare Costa Rica SRL in August 2003.  Because of Christensen's positions, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the relevant period, Christensen participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Christensen sold 112,500 shares of ArthroCare stock for proceeds of over $3.8 million during the relevant period.  Defendant Sanchez may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

17.     Defendant John H. Giroux, Sr. ("Giroux") has served as a President, ArthroCare Sports Medicine, a business unit of ArthroCare, since November 2004.  Previously, Giroux served as Senior Vice President, Surgical Business Units of ArthroCare from October 2002 until his promotion in 2004.  Because of Giroux's positions, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the relevant period, Giroux participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Giroux sold 215,216 shares of ArthroCare stock for

proceeds of over $8.6 million during the relevant period.  Defendant Giroux may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

18.     Defendant John R. Tighe ("Tighe") was Senior Vice President, General Manager of Strategic Business Units of ArthroCare from September 2004 until June 2006.  Previously, Tighe served as the Director of Sales of ArthroCare in May 1995 and was promoted to Vice President, Worldwide Sales and Marketing in January 1999 until his promotion to his current position in 2004. Because of Tighe's positions, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the relevant period, Tighe participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Tighe sold 307,707 shares of ArthroCare stock for proceeds of over $10.8 million during the relevant period.  Defendant Tighe may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

19.     Defendant Ron Underwood ("Underwood") has been Vice President and General Manager of ArthroCare ENT and Visage, a division of ArthroCare, since 2004.  Previously, Underwood served as the Director of New Products of ArthroCare from 1997 until his promotion to his current position in 2004.  Because of Underwood's positions, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and

other information provided to him in connection therewith. During the relevant period, Underwood participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Underwood sold 30,125 shares of ArthroCare stock for proceeds of over $853,344 during the relevant period. Defendant Underwood may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

20.     Defendant David Applegate ("Applegate") has been Vice President, General Manager, ArthroCare Spine, a division of ArthroCare, since 2004. Previously, Applegate served as Vice President and General Manager of the Visage Cosmetic Business Unit of ArthroCare from 2001 until late 2003, when he became Vice President and General Manager of ArthroCare ENT from late 2000 through early 2004, when he was promoted to his current position. Because of Applegate's positions, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Applegate participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Applegate sold 10,000 shares of ArthroCare stock for proceeds of $278,758 during the relevant period. Defendant Applegate may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

21.     Defendant Bruce Prothro ("Prothro") has been Vice President and General Manager, Coblation Technologies and Regulatory Affairs of ArthroCare since November 2002. Previously,

Prothro served as Vice President, Regulatory Affairs and Quality Assurance of Arthrocare from October 1998 until April 2002, when he became Vice President, Operational Planning. Defendant Prothro served in this position until his promotion to his current position in November 2002. Because of Prothro's positions, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Prothro participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Prothro sold 30,125 shares of ArthroCare stock for proceeds of over $853,344 during the relevant period. Defendant Prothro may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

22.     Defendant John T. Raffle ("Raffle") has been Vice President, Corporate Development and Legal Affairs of ArthroCare since June 2001. Previously, Raffle served as Director, Intellectual Property of ArthroCare from September 1997 until he was promoted in January 2001 to Managing Director, Corporate Development and Legal Affairs. Raffle served in this position until his promotion to his current position in June 2001. Because of Raffle's positions, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Raffle participated in the issuance of false and/or misleading statements, including the

preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Raffle sold 136,442 shares of ArthroCare stock for proceeds of over $5 million during the relevant period. Defendant Raffle may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

23.     Defendant Jean A. Woloszko ("Woloszko") has served as Vice President, Chief Technical and Scientific Officer of ArthroCare since 2003. Previously, Woloszko was Medical Director of ArthroCare from 1998 until 1999, when he was promoted to Vice President Research and Development of ArthroCare and served in this capacity until his promotion to his current position in 2003. Because of Woloszko's positions, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Woloszko participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Woloszko sold 21,360 shares of ArthroCare stock for proceeds of $629,525 during the relevant period. Defendant Woloszko may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

24.     Defendant Barbara D. Boyan ("Boyan") has been a director of ArthroCare since March 2004. Because of Boyan's position, she knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and

other information provided to her in connection therewith.  As a member of the Compensation Committee, defendant Boyan controlled the other Defendants' stock option awards.  As a member of the Nominating and Corporate Governance Committee, defendant Boyan caused or allowed the dissemination of the improper public statements described herein.  During the relevant period, Boyan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Boyan may be served at 898 Byrnwyck Drive, Atlanta, Georgia 30319.

25.     Defendant David F. Fitzgerald ("Fitzgerald") has been a director of ArthroCare since April 2003.  Because of Fitzgerald's position, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Audit Committee, defendant Fitzgerald caused or allowed the dissemination of the improper public statements described herein.  As a member (Chair) of the Compensation Committee, defendant Fitzgerald controlled the other Defendants' stock option awards.  During the relevant period, Fitzgerald participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Fitzgerald may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

26.     Defendant James G. Foster ("Foster") has been a director of ArthroCare since August 2002.  Because of Foster's position, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and

employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member of the Nominating and Corporate Governance Committee, defendant Foster caused or allowed the dissemination of the improper public statements described herein. As a member of the Compensation Committee, defendant Foster controlled the other Defendants' stock option awards. During the relevant period, Foster participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Foster may be served at 4707 Sunnyside Road, Edina, Minnesota 55424.

27. Defendant Tord B. Lendau ("Lendau") has been a director of ArthroCare since June 2001. Because of Lendau's position, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member (Chair) of the Nominating and Corporate Governance Committee, defendant Lendau caused or allowed the dissemination of the improper public statements described herein. During the relevant period, Lendau participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Lendau may be served at 111 Congress Avenue, Suite 510, Austin, Texas 78701.

28. Defendant Jerry P. Widman ("Widman") has been a director of ArthroCare since November 2002. Because of Widman's position, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member (Chair) of the Audit Committee, defendant Widman allowed the dissemination of the improper public statements described herein. During the relevant period, Widman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Widman sold 25,000 shares of ArthroCare stock for proceeds of over $1 million during the relevant period. Defendant Widman may be served at 30914 Kilgour Drive, Westlake, Ohio 44145.

29.     Defendant Peter L. Wilson ("Wilson") has been a director of ArthroCare since June 2001. Because of Wilson's position, he knew the adverse non-public information about the business of ArthroCare, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member of the Audit Committee, defendant Wilson allowed the dissemination of false statements alleged herein. As a member of the Compensation Committee, defendant Wilson controlled the other Defendants' stock option awards. During the relevant period, Wilson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Wilson sold 1,500 shares of ArthroCare stock for proceeds of $69,690 during the relevant period. Defendant Wilson may be served at 186 Nearwater Lane, Darien, Connecticut 06820.

30.     The defendants identified in ¶¶13 and 24-29 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶13-23 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-23 and 28-29 are referred to herein as the "Insider Selling Defendants."

## DEFENDANTS' DUTIES

31.     Each officer and director of ArthroCare named herein owed the Company and ArthroCare shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of ArthroCare's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of ArthroCare.  Further, the misconduct of ArthroCare's officers has been ratified by ArthroCare's Board, which has failed to take any legal action on behalf of the Company against them.

32.     By reason of their positions as officers, directors and fiduciaries of ArthroCare and because of their ability to control the business and corporate affairs of the Company, the Defendants owed ArthroCare and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage ArthroCare in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of ArthroCare and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control over ArthroCare to divert assets to themselves via improper and/or unlawful practices.  Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

33.     Because of their positions of control and authority as directors or officers of ArthroCare, each of the Defendants was able to and did, directly and indirectly, control the wrongful

acts complained of herein. As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' option backdating scheme; (ii) willingness to cause ArthroCare to disseminate false Proxy Statements for 1996-2006, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received. Because of their positions with ArthroCare, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to ArthroCare shareholders and the financial markets but failed to do so.

34.   Between 1996 and 2006, Defendants concealed that the stock option grants had been repeatedly and consciously *backdated* to ensure that the strike price associated with the option grants was at or near the lowest trading price for that fiscal period. Due to Defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiff seeks to have the directors' and officers' plans voided and gains from those plans returned to the Company. In the alternative, plaintiff seeks to have all of the unexercised options granted to defendants from as early as 1996 to 2002 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have Defendants revise the Company's financial statements to reflect the truth concerning these option grants.

35.   To discharge their duties, the directors of ArthroCare were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of ArthroCare. By virtue of such duties, the officers and directors of ArthroCare were required, among other things, to:

(a)     manage, conduct, supervise and direct the business affairs of ArthroCare in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of ArthroCare);

(b)     neither engage in self-dealing nor knowingly permit any officer, director or employee of ArthroCare to engage in self-dealing;

(c)     neither violate nor knowingly permit any officer, director or employee of ArthroCare to violate applicable laws, rules and regulations;

(d)     remain informed as to the status of ArthroCare's operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of ArthroCare and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that ArthroCare's financial statements – including its

expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise control and supervision over the public statements to the securities markets and trading in ArthroCare stock by the officers and employees of ArthroCare; and

(i)     supervise the preparation and filing of any financial reports or other information required by law from ArthroCare and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of ArthroCare and to make full and accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

36.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of ArthroCare, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Defendants who were officers and/or directors of the Company during the relevant period has been ratified by the Director Defendants who comprised ArthroCare's entire Board during the relevant period.

37.     Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Defendants from taking such illegal actions.  As a result,

ArthroCare has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

    (a)    improvidently paid executive compensation;

    (b)    increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

    (c)    costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

    (d)    incurring possible IRS penalties for improperly reporting compensation.

38.    These actions have irreparably damaged ArthroCare's corporate image and goodwill. For at least the foreseeable future, ArthroCare will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ArthroCare's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION

39.    In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

40.    During all times relevant hereto, Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert hundreds of millions of dollars to ArthroCare insiders and directors and causing ArthroCare to misrepresent its financial results; (ii) maintain Defendants' executive and directorial positions at ArthroCare and the profits, power and prestige which Defendants enjoyed as a result of these positions; and (iii) deceive the investing public,

including shareholders of ArthroCare, regarding Defendants' compensation practices and ArthroCare's financial performance.

41.     The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of ArthroCare common stock so they could dispose of millions of dollars of their own ArthroCare stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

42.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent ArthroCare's financial results. Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

43.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

44.     ArthroCare is a medical device company that develops, manufactures and markets products based on its Coblation technology. The Company has also developed, manufactured and marketed Coblation-based and complementary products for application in neurology, cosmetic surgery, urology and gynecology, with research continuing in additional areas. The Company

operates in four segments: Sports Medicine; Ear, Nose and Throat; ArthroCare Spine; and Coblation Technology.  In each of its business units, the Company is focused on driving the application of enabling technologies, primarily for plasma-based soft tissue removal and increasing the number of minimally invasive procedures being performed.

45.     Throughout the relevant period, Defendants caused ArthroCare to grant them millions of stock options permitting them to buy ArthroCare stock for pennies on the dollar which they could in turn sell as the Company's stock price increased.  A stock option gives the holder the right to buy a stock at a certain price in the future.  Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

46.     However, many of the millions of options granted to ArthroCare's executives had a hidden, valuable component:  they were misdated, often making them even more significantly valuable.  The misdated stock option grants fell largely into three categories: (i) "look back" grants, in which the date of the grant was picked retroactively (*e.g.,* a decision in February to pick a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized – and sometimes changed – at a later date (*e.g.,* a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where there was a failure to complete the option grant process by the date of the grant (*e.g.,* where there is a decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used).

**STOCK OPTION GRANTS**

47.     Certain of ArthroCare's manipulative stock option grants are described below (unadjusted for subsequent stock splits):

**1999 Option Grants**

48.     Defendants dated most of ArthroCare's options to top officers as of August 31, 1999 at $34.75 per share, just a week before the stock increased to $54.13 per share – a risk-free gain of almost $20 per option.  Defendants Tighe, Baker and Prothro received 15,000, 40,000 and 10,000 options, respectively, at the $34.75 per share exercise price.  Defendants dated others of ArthroCare's 1999 options to top executives as of March 1, 1999 at $14.00 per share – the low of the month.  The stock reached $18.12 per share in March 1999.  Defendant Tighe received 30,000 options at this exercise price.

**2000 Option Grants**

49.     Defendants dated most of ArthroCare's options to top executives in 2000 as of June 21, 2000 at $23.00 per share – the low of the month.  The stock reached $42.31 per share in June 2000.  Defendants Baker, Prothro, Tighe and Woloszko received 80,000, 40,000, 40,000 and 40,000 options, respectively, at this exercise price.  Defendants dated the remainder of ArthroCare's 2000 options to top officers as of October 20, 2000 at $16.75 per share – one trading day before the stock reached $22.62 per share.  Defendants Tighe, Baker, Prothro and Woloszko each received 10,000 options at the $16.75 per share exercise price.

**2001 Option Grants**

50.     Defendants dated all of ArthroCare's 2001 options to top executives as of July 30, 2001 at $27.56 per share – near the low of the month – just three days before the stock reached $32.10 per share.  Defendants Baker and Tighe received 120,000 and 30,000 options, respectively, at this exercise price.

- 21 -

**2002 Option Grants**

51.     Defendants dated many of ArthroCare's 2002 options to top executives as of June 7, 2002 at $10.00 per share – near the low of the month.  The stock reached $13.45 per share in June 2002.   Defendants Baker, Raffle and Tighe received 30,000, 15,000 and 15,000 options, respectively, at this exercise price.

52.     Below are certain of ArthroCare's stock option grants which occurred right before significant stock price increases (adjusted for stock splits):



**ArthroCare Corp.**
**Daily Share Pricing: February 1, 1999 to March 31, 1999**



**ArthroCare Corp.**
Daily Share Pricing: July 30, 1999 to October 1, 1999



**ArthroCare Corp.**
Daily Share Pricing: September 20, 2000 to November 20, 2000

- 23 -



**ArthroCare Corp.**
Daily Share Pricing: June 29, 2001 to August 30, 2001



**ArthroCare Corp.**
Daily Share Pricing: May 7, 2002 to July 8, 2002

- 24 -

53.     Complicating matters and magnifying the harm to ArthroCare, during the relevant period, ArthroCare's internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate.  The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated.  They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

54.     Specifically, in many instances the reported dates ArthroCare stock options were granted differed from the dates on which the options appear to have been actually granted.  The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose.

55.     Through their fiduciary duties of care, good faith and loyalty, Defendants owed to ArthroCare a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.  This material non-public information included the problems ArthroCare faced because of its deficient internal controls.  Furthermore, defendants Fitzgerald, Wilson and Widman, as members of the Audit Committee during the relevant period, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with

respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies. Defendants, as directors or officers of ArthroCare, had ample opportunity to discuss this material information with fellow directors or officers at any of the scores of Board or management meetings that occurred during the relevant period as well as at committee meetings of the Board. Despite these duties, Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the misleading statements to be disseminated by ArthroCare to the investing public and the Company's shareholders during the relevant period.

56.     Specifically, since at least 1996, Defendants have caused ArthroCare to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| FISCAL YEAR | REPORTED EARNINGS (LOSS) (in millions) | REPORTED DILUTED EARNINGS (LOSS) PER SHARE FROM CONTINUING OPERATIONS |
|---|---|---|
| 1996 | $(7.71) | $(0.49) |
| 1997 | $(7.69) | $(0.44) |
| 1998 | $(2.14) | $(0.12) |
| 1999 | $5.54 | $0.27 |
| 2000 | $15.85 | $0.68 |
| 2001 | $10.06 | $0.43 |
| 2002 | $1.13 | $0.17 |
| 2003 | $7.46 | $0.34 |
| 2004 | $(26.19) | $0.56 |
| 2005 | $23.53 | $0.96 |

57.     Meanwhile, Defendants were causing the Company to grant them millions of stock options, many of which were misdated. The Company's executive directors and officers also received a significant number of stock options as compensation during the relevant period. In total, during the relevant period Defendants caused the Company to grant them millions of stock options, many of which, the evidence will show, were misdated.

- 26 -

58.    Moreover, throughout the relevant period certain Defendants exercised many of these

stock options contributing to their ability to sell over $63 million worth of ArthroCare stock – stock

they obtained often by cashing in under-priced stock options:

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| BAKER | 02/04/00–08/14/06 | 597,800 | $25,667,248 |
| GLUK | 08/10/06 | 1,150 | $52,900 |
| SANCHEZ | 11/11/03–05/08/06 | 74,220 | $3,326,627 |
| TIGHE | 07/26/99–05/12/06 | 307,707 | $10,860,500 |
| GIROUX | 12/02/03–08/28/06 | 215,216 | $8,634,041 |
| APPLEGATE | 05/28/04–10/28/04 | 10,000 | $278,758 |
| PROTHRO | 02/02/00–11/09/04 | 108,000 | $3,582,319 |
| RAFFLE | 11/27/00–05/15/06 | 136,442 | $5,038,093 |
| WOLOSZKO | 03/02/01–12/01/04 | 21,360 | $629,525 |
| WIDMAN | 05/26/06 | 25,000 | $1,060,750 |
| WILSON | 02/17/06 | 1,500 | $69,690 |
| CHRISTENSEN | 05/12/04–02/15/06 | 112,500 | $3,887,473 |
| TOTAL | | 1,610,895 | $63,087,924 |

59.    Then, on August 23, 2006, ArthroCare filed a Form 8-K about an SEC inquiry into its

past stock option practices:

> ArthroCare Corp., a multi-business medical device company that develops minimally
> invasive surgical products, announced today that it has received correspondence from
> the Securities and Exchange Commission requesting certain documents and
> information related to the Company's stock option grant practices. Earlier this year
> and prior to receiving this request, the Company undertook an internal review of all
> of its equity compensation activities from the time of its initial public offering in
> February 1996 to the present. Based on the results of this review, the Company
> believes that there have been no unusual patterns in the timing or pricing of equity
> awards and there is specifically no evidence of backdating of option awards.
> ArthroCare intends to cooperate fully with all matters related to this request.

60.    In effect, during the relevant period, the Defendants caused ArthroCare's shares to

trade at artificially inflated levels by issuing a series of materially false and misleading statements

regarding the Company's financial statements, business and prospects. Specifically, Defendants

caused or allowed ArthroCare to issue statements that failed to disclose or misstated the following:

(i) that the Company had problems with its internal controls that prevented it from issuing accurate

financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of ArthroCare's earnings and earnings per share.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

61.    Plaintiff brings this action derivatively in the right and for the benefit of ArthroCare to redress injuries suffered and to be suffered by ArthroCare as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

62.    Plaintiff will adequately and fairly represent the interests of ArthroCare and its shareholders in enforcing and prosecuting its rights.

63.    Plaintiff is an owner of ArthroCare stock and was an owner of ArthroCare stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

64.    Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the ArthroCare Board of Directors to institute this action against the officers and members of the ArthroCare Board of Directors is excused as futile. A pre-filing demand would be a useless and futile act because:

(a)    The members of ArthroCare's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who

- 28 -

are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(b)     The ArthroCare Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from ArthroCare's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting. Pursuant to their specific duties as Board members, the Director Defendants are charged with the management of the Company and to conduct its business affairs. Defendants breached the fiduciary duties that they owed to ArthroCare and its shareholders in that they failed to prevent and correct the improper stock option granting and financial reporting. Certain directors are also dominated and controlled by other directors and cannot act independently of them. Thus, the ArthroCare Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

(c)     The acts complained of constitute violations of the fiduciary duties owed by ArthroCare's officers and directors and these acts are incapable of ratification.

(d)     The members of ArthroCare's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their

- 29 -

positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(e)     Any suit by the current directors of ArthroCare to remedy these wrongs would likely further expose the liability of Defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(f)     ArthroCare has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for ArthroCare any part of the damages ArthroCare suffered and will suffer thereby.

(g)     In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other Defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS penalties. This they will not do.

(h)     ArthroCare's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of ArthroCare. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by ArthroCare against these Defendants, known as, *inter alia,* the "insured versus insured

exclusion." As a result, if these directors were to sue themselves or certain of the officers of ArthroCare, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

      (i)    In order to bring this action for breaching their fiduciary duties, the members of the ArthroCare Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

      65.    Plaintiff has not made any demand on shareholders of ArthroCare to institute this action since such demand would be a futile and useless act for the following reasons:

      (a)    ArthroCare is a publicly traded company with approximately 26 million shares outstanding, and thousands of shareholders;

      (b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

      (c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT ON ARTHROCARE'S FINANCIAL STATEMENTS

**The Fiscal 1996 Form 10-K**

      66.    On or about March 28, 1997, the Company filed its fiscal 1996 Form 10-K with the SEC. The fiscal 1996 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1996 Form 10-K included ArthroCare's 1996 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the

backdated stock options. As a result, ArthroCare's compensation expense was understated and its net earnings were overstated.

**The Fiscal 1997 Form 10-K**

67.     On or about April 3, 1998 the Company filed its fiscal 1997 Form 10-K with the SEC. The fiscal 1997 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1997 Form 10-K included ArthroCare's 1997 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ArthroCare's compensation expense was understated and its net earnings were overstated.

**The Fiscal 1998 Form 10-K**

68.     On or about April 2, 1999, the Company filed its fiscal 1998 Form 10-K with the SEC. The fiscal 1998 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1998 Form 10-K included ArthroCare's 1998 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ArthroCare's compensation expense was understated and its net earnings were overstated.

**The Fiscal 1999 Form 10-K405**

69.     On or about March 31, 2000, the Company filed its fiscal 1999 Form 10-K405 with the SEC. The 1999 Form 10-K405 was simultaneously distributed to shareholders and the public. The 1999 Form 10-K405 included ArthroCare's 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ArthroCare's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2000 Form 10-K405**

70.     On or about March 30, 2001, the Company filed its fiscal 2000 Form 10-K405 with the SEC. The 2000 Form 10-K405 was simultaneously distributed to shareholders and the public. The 2000 Form 10-K405 included ArthroCare's 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ArthroCare's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2001 Form 10-K**

71.     On or about March 29, 2002, the Company filed its fiscal 2001 Form 10-K with the SEC. The 2001 Form 10-K was simultaneously distributed to shareholders and the public. The 2001 Form 10-K included ArthroCare's 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ArthroCare's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2002 Form 10-K**

72.     On or about March 31, 2003, the Company filed its fiscal 2002 Form 10-K with the SEC. The 2002 Form 10-K was simultaneously distributed to shareholders and the public. The 2002 Form 10-K included ArthroCare's 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ArthroCare's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2003 Form 10-K**

73.     On or about March 15, 2004, the Company filed its fiscal 2003 Form 10-K with the SEC. The 2003 Form 10-K was simultaneously distributed to shareholders and the public. The

2003 Form 10-K included ArthroCare's 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ArthroCare's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2004 Form 10-K**

74.    On or about March 31, 2005, the Company filed its fiscal 2004 Form 10-K with the SEC.  The 2004 Form 10-K was simultaneously distributed to shareholders and the public.  The 2004 Form 10-K included ArthroCare's 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, ArthroCare's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2005 Form 10-K**

75.    On or about March 24, 2006, the Company filed its fiscal 2005 Form 10-K with the SEC.  The 2005 Form 10-K was simultaneously distributed to shareholders and the public.  The 2005 Form 10-K included ArthroCare's 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, ArthroCare's compensation expense was understated and its net earnings were overstated.

76.    The materially false and misleading 1996-2005 Form 10-Ks described above were reviewed, prepared and/or endorsed by the Director Defendants.

## DEFENDANTS' SCHEME BEGINS TO UNRAVEL

77.    The 1996-2006 Proxy Statements concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between 1996 and 2006.  In fact, it was not until August 2006 that shareholders

learned that the Proxy Statements which they had relied upon for years were false and misleading. Defendants have been unjustly enriched at the expense of ArthroCare, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

78.    On August 23, 2006, ArthroCare announced that the SEC had initiated an inquiry of ArthroCare's stock option grant practices.

79.    Each dollar diverted to Defendants via the option backdating scheme has come at the expense of the Company.  For example, if Baker's 80,000 options granted in June 2001 had not been manipulated, but rather had a strike price of $40,000, instead of the $23.00 strike price, which was the trading low for the month, when Baker exercised those options the Company would receive $3.2 million instead of $1.84 million – *a cost to the Company of $1.36 million for this single instance of option backdating.*

### THE ADVERSE IMPACT OF DEFENDANTS' MISCONDUCT

80.    Unlike most companies which avoid such option backdating abuse by issuing stock option grants at the same time each year, which eliminates the potential for backdating, Defendants ensured that executives would not have any such restrictions.  Given the many times ArthroCare's grants were the low of the month in which options were granted, the date of their stock option grants was clearly more than merely coincidental.

81.    As a result of the backdating of options, Defendants have been unjustly enriched at the expense of ArthroCare, which has received and will receive less money from Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

## TOLLING OF THE STATUTE OF LIMITATIONS

82.    The Counts alleged herein are timely.  As an initial matter, Defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading Proxy Statements, by falsely reassuring ArthroCare's public investors that ArthroCare's option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

83.    ArthroCare's public investors had no reason to know of the Defendants' breaches of their fiduciary duties until August 2006 when the Company announced it had initiated an internal review of its stock option grant practices following an SEC inquiry at ArthroCare.

84.    Finally, as fiduciaries of ArthroCare and its public shareholders, the Defendants cannot rely on any limitations defense where they withheld from ArthroCare's public shareholders the facts that give rise to the claims asserted herein, *i.e.,* that the ArthroCare Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

## COUNT I

### Violations of §14(a) of the Exchange Act Against
### All Defendants

85.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

86.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

87.     The 1996-2006 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that certain of the Defendants were causing ArthroCare to engage in an option backdating scheme, a fact that Defendants were aware of and participated in from at least 1996.

88.     In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

89.     The misrepresentations and omissions in the Proxy Statements were material to plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

90.     The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT II

### Accounting

91.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.    At all relevant times, Defendants, as directors and/or officers of ArthroCare, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

93.    In breach of their fiduciary duties owed to ArthroCare and its shareholders, the Defendants caused ArthroCare, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of ArthroCare and/or failed to properly investigate whether these grants had been improperly made.  By this wrongdoing, the Defendants breached their fiduciary duties owed to ArthroCare and its shareholders.

94.    The Defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to certain of the Defendants.

95.    As a result of Defendants' misconduct, ArthroCare has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

96.    Plaintiff demands an accounting be made of all stock option grants made to any of the Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to any of the Defendants, as well as the disposition of any proceeds received by any of the Defendants via sale or other exercise of backdated stock option grants received by those Defendants.

## COUNT III

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

97.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

98.     Each of the Defendants agreed to and did participate with Baker and Tighe, and the other Defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties the Defendants owed to the Company.

99.     The Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to ArthroCare and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of ArthroCare and its shareholders.

100.    As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to ArthroCare and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.

101.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward ArthroCare and its public shareholders.

102.    As a proximate result of Defendants' conduct, in concert with Baker and Tighe, ArthroCare has been injured and is entitled to damages.

## COUNT IV

### Abuse of Control Against All Defendants

103.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

104.    The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, ArthroCare, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at ArthroCare.  As a part of this scheme, Defendants actively made and/or

participated in the making of or aided and abetted the making of, misrepresentations regarding ArthroCare.

106. By reason of the foregoing, ArthroCare has been damaged.

105. Defendants' conduct constituted an abuse of their ability to control and influence ArthroCare.

106. By reason of the foregoing, ArthroCare has been damaged.

## COUNT V

### Gross Mismanagement Against All Defendants

107. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108. Defendants had a duty to ArthroCare and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of ArthroCare.

109. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of ArthroCare in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of ArthroCare's affairs and in the use and preservation of ArthroCare's assets.

110. During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused ArthroCare to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to ArthroCare, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged ArthroCare.

111. By reason of the foregoing, ArthroCare has been damaged.

## COUNT VI

### Constructive Fraud Against All Defendants

112.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

113.    As corporate fiduciaries, Defendants owed to ArthroCare and its shareholders a duty of candor and full accurate disclosure regarding the true state of ArthroCare's business and assets and their conduct with regard thereto.

114.    As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from ArthroCare's shareholders despite their duties to, *inter alia,* disclose the true facts regarding their stewardship of ArthroCare.  Thus they have committed constructive fraud and violated their duty of candor.

115.    By reason of the foregoing, ArthroCare has been damaged.

## COUNT VII

### Corporate Waste Against All Defendants

116.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to Defendants via the option backdating scheme, Defendants have caused ArthroCare to waste valuable corporate assets.

118.    As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT VIII

### Unjust Enrichment Against All Defendants

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

120.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of ArthroCare, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

121.    All the payments and benefits provided to the Defendants were at the expense of ArthroCare.  The Company received no benefit from these payments.  ArthroCare was damaged by such payments.

122.    Certain of the Defendants sold ArthroCare stock for a profit during the period of deception, misusing confidential non-public corporate information.  These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of ArthroCare.  A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT IX

### Against the Officer Defendants for Rescission

123.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

124.    As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and ArthroCare entered into during the relevant period were obtained through Defendants' fraud, deceit and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's stock option plan which was also approved by ArthroCare shareholders and filed with the SEC.

125.    All contracts which provide for stock option grants between the Officer Defendants and ArthroCare and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT X

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold ArthroCare common stock on the basis of such information.

128.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold ArthroCare common stock.

129.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of ArthroCare common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

130.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

- 43 -

A.    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.    Directing ArthroCare to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(i)    a proposal requiring that the office of CEO of ArthroCare and Chairman of the ArthroCare Board of Directors be permanently held by separate individuals and that the Chairman of the ArthroCare Board meets rigorous "independent" standards;

(ii)    a proposal to strengthen the ArthroCare Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)    appropriately test and then strengthen the internal audit and control function;

(iv)    rotate independent auditing firms every five years;

(v)    control and limit insider stock selling and the terms and timing of stock option grants; and

(vi)    reform executive compensation.

D.      Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

E.      Awarding punitive damages;

F.      Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

G.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 3, 2007                    PROVOST & UMPHREY LAW FIRM, LLP
                                          JOE KENDALL
                                          State Bar No. 11260700
                                          WILLIE C. BRISCOE
                                          State Bar No. 24001788


                                          *Joe Kendall*
                                          ─────────────────────────
                                          JOE KENDALL

                                          3232 McKinney Avenue, Suite 700
                                          Dallas, TX  75204
                                          Telephone:  214/744-3000
                                          214/744-3015 (fax)

                                          LERACH COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                          WILLIAM S. LERACH
                                          DARREN J. ROBBINS
                                          TRAVIS E. DOWNS III
                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101-3301
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
121 N. Wayne Avenue, Suite 100
Wayne, PA  19087
Telephone:  610/225-2677
610/225-2678 (fax)

Attorneys for Plaintiff

S:\CptDraft\Derivative\Cpt ArthroCare Derv.doc

## ARTHROCARE CORPORATION VERIFICATION

I, Marvin Duane Lee, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: _NOU  2  06_        _Marvin D Lee_
                           SIGNATURE

℀JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

MARVIN DUANE LEE, Derivatively on Behalf of Arthrocare Corporation

**(b)**  County of Residence of First Listed Plaintiff _____

(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Joe Kendall, Provost Umphrey Law Firm, LLP, 3232 McKinney Avenue, Suite 700, Dallas, Texas 75204, telephone 214-744-3000

## DEFENDANTS

MICHAEL A. BAKER, MICHAEL THOMAS GLUK, FERNANDO V. SANCHEZ, RICHARD A. CHRISTENSEN, JOHN H. GIROUX, SR., JOHN R. TIGHE, RON UNDERWOOD, DAVID APPLEGATE, BRUCE PROTHRO, JOHN T. RAFFLE, JEAN A. WOLOSZKO, BARBARA D. BOYAN, DAVID F. FITZGERALD, JAMES G. FOSTER, TORD B. LENDAU, JERRY P. WIDMAN AND PETER L. WILSON

County of Residence of First Listed Defendant   Travis County, Texas

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

A07CA009  SS

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                               and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
_____

Brief description of cause:
Violations of the Federal Securities Laws and State Law Claims for Breach of Fiduciary Duty

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE _____   DOCKET NUMBER _____

DATE  1/3/07

SIGNATURE OF ATTORNEY OF RECORD   Joe Kendall

FOR OFFICE USE ONLY

RECEIPT # 4445   AMOUNT 350   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AO82
(Rev. 4/90)

ORIGINAL

404445

**RECEIPT FOR PAYMENT**
**UNITED STATES DISTRICT COURT**
**for the**
**WESTERN DISTRICT OF TEXAS**
at _____ *Austin* _____

RECEIVED FROM *Prouest Umphrey Law firm*
*3232 McKinney Ave # 700*
*Dallas Tx 75204*

| | ACCOUNT | AMOUNT |
|---|---|---|
| Fund | | |
| 6855XX   Deposit Funds | 086900 | 60 00 |
| 604700   Registry Funds | 510000 | 190 00 |
| General and Special Funds | | |
| 508800   Immigration Fees | 086400 | 100 00 |
| 085000   Attorney Admission Fees | | |
| 086900   Filing Fees | TOTAL | 350.00 |

| Fund | | |
|---|---|
| 322340 | Sale of Publications |
| 322350 | Copy Fees |
| 322360 | Miscellaneous Fees |
| 143500 | Interest |
| 322380 | Recoveries of Court Costs |
| 322386 | Restitution to U.S. Government |
| 121000 | Conscience Fund |
| 129900 | Gifts |
| 504100 | Crime Victims Fund |
| 613300 | Unclaimed Monies |
| 510000 | Civil Filing Fee (½) |
| 510100 | Registry Fee |

Case Number or Other Reference

*1:07-CV-009*

*New Case*

*Lee v. Baker*

$ Checks and drafts are accepted subject to col-
lection and full credit will only be given when the
check or draft has been accepted by the financial
institution on which it was drawn.   *1088*

| DATE | Cash | Check | M.O. | Credit | DEPUTY CLERK: |
|---|---|---|---|---|---|
| 1-4 2007 | | X | | | |